No. 19-1946

In the United States Court of Appeals
For the Eighth Circuit

Jeremy A Rowles,
*Plaintiff/Appellant,*
v.
The Curators of the University of Missouri,
Cathy Scroggs,
Ellen Eardley,
Salama Gallimore,
and
Andrea Hays,
*Defendants/Appellees.*

On Appeal from
The United States District Court for the Western District of Missouri
No. 2:17-cv-04250-BCW

BRIEF OF PLAINTIFF/APPELLANT

J. Andrew Hirth
MO Bar No. 57807
**TGH LITIGATION LLC**
28 N 8th St, Suite 500
Columbia, MO 65201
(573) 256 – 2850
andy@TGHLitigation.com
Attorneys for Appellant
Jeremy A. Rowles

## SUMMARY OF THE CASE

The University of Missouri's Title IX Office suspended Appellant Jeremy Rowles ("Rowles"), an African American man, for two years for harassing and stalking A.B., a white woman, on the basis of sex. The alleged harassment and stalking comprise: a single request for a date, a week's worth of flirtatious Facebook messages, regular attendance at dance-fitness classes A.B. taught at the Student Rec Center, an email exchange inquiring about private dance lessons, and a three-page letter Rowles handed to A.B. in which he expressed his romantic feelings. Except for attending classes (along with many other students), the alleged harassment and stalking consists solely of speech. A.B. never alleged that she felt threatened or intimidated by Rowles, only that his behavior was "bizarre" and made her "uncomfortable." The University disciplined only two other students for harassment and stalking based on sex during the same period. Both students are white. One was ordered to undergo counseling. The other—who was *also* found responsible for "non-consensual sexual intercourse" —was suspended for just six months.

Rowles brought claims against the University and several employees for violations of the First and Fourteenth Amendments as well as federal and state statutes prohibiting discrimination based on race and gender. The court dismissed four of Rowles' claims and granted summary judgment to Defendants on the other five. Given the number and complexity of issues involved, Rowles requests each side be allowed 30 minutes of oral argument.

Appellate Case: 19-1946    Page: 2    Date Filed: 09/05/2019 Entry ID: 4827248

# TABLE OF CONTENTS

SUMMARY OF THE CASE ................................................................. ii

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES ................................................................. vii

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF THE ISSUES ................................................................. 2

STATEMENT OF THE CASE ................................................................. 5

    A. Rowles pursues a romantic relationship with A.B. ................................. 5

    B. The Title IX Office suspends Rowles for sexual harassment
    and stalking ................................................................. 6

    C. White students found responsible for sexual harassment, stalking,
    and sexual assault receive less punishment than Rowles.. ........................ 11

    D. Defendants withhold information necessary to determine whether
    Rowles was similarly situated to white students who received
    lesser punishment for more serious violations. ................................. 13

    E. Defendants disagree among themselves about the meaning
    of the University's sexual harassment and stalking policies. ..................... 14

    F. The district court denies Rowles's motion for partial summary judgment
    and grants all of Defendants' motions for summary judgment. ..................

SUMMARY OF THE ARGUMENT ................................................................. 33

ARGUMENT ................................................................. 36

    I. The district court erred in dismissing Rowles's claims for substantial
    overbreadth, sex discrimination in violation of Title IX and the
    Missouri Human Rights Act ("MHRA"), and race discrimination
    in violation of the MHRA. ................................................................. 36

Appellate Case: 19-1946     Page: 3     Date Filed: 09/05/2019 Entry ID: 4827248

A. Standard of Review ...................................................... 36

B. Rowles stated a claim that the University's policies against
   sexual harassment and stalking are substantially overbroad. ................. 36

C. Rowles stated a claim that the University discriminated against
   him on the basis of sex in violation of Title IX. ...................................... 41

D. Rowles stated claims for race and sex discrimination under
   the Missouri Human Rights Act. ................................................ 46

II. The district court erred in denying Rowles's motion to compel
    the University to disclose the factual basis for treating two white
    students less harshly for the same or more serious rules violations. ........... 50

A. Standard of Review ...................................................... 50

B. The University's purported bases for treating white students
   differently for violating the same rules is discoverable and
   its disclosure should have been compelled. ................................... 51

III. The district court erred in granting summary judgment to the
University on Rowles's claims for First Amendment retaliation,
     vagueness, and race discrimination in violation of Title VI. ...................... 56

A. Standard of Review ...................................................... 56

B. Genuine issues of material fact precluded summary judgment
   on Rowles's First Amendment retaliation claim ...................................... 56

   1. Defendant Hayes is not entitled to Eleventh Amendment
      immunity when sued in her official capacity for prospective
      injunctive relief ...................................................... 57

   2. Rowles raised a genuine dispute of material fact whether
      Eardley and Scroggs took adverse action against him for
      engaging in protected speech. ................................................ 58

      a. Rowles's amorous speech is fully protected. .................................. 59

iv

b. Rowles raised a genuine issue of material fact as to
whether his protected speech was at all motivated the
adverse action taken against him by Eardley and Scroggs...........63

C. The University's rules against sexual harassment and stalking on
the basis of sex are unconstitutionally vague as applied to Rowles. ......65

1. Defendants cannot even agree amongst themselves as to the
scope of conduct prohibited by CRR 200.010.C.7.b. .......................68

2. The definition of "stalking on the basis of sex" does not provide
explicit standards for those who apply the rule and is based
largely on the subjective feelings of the complaining student. .........72

D. Rowles raised triable issues of fact precluding summary judgment
on his Title VI claim. ....................................................................77

CONCLUSION ..................................................................................81

CERTIFICATE OF COMPLIANCE ....................................................82

ADDENDUM....................................................................................83

Order Granting and Denying in Part Defendants Motion to Dismiss..................84

Order Denying Plaintiff's Motion to Compel...........................................110

Order Denying Plaintiff's Motion for Partial Summary Judgment
as to Counts I, III, and VI................................................................115

Order Granting Curators Motion for Summary Judgment......................122

Order Granting Eardley's, Hayes's, Gallimore, and Scroggs's
Motions for Partial Summary Judgment................................................131

CRR 200.010 ..................................................................................147

v

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Univ. of D.C.*,
    528 F. Supp. 1215 (D.D.C. 1981) ................................................................ 52

*Ajiwoju v. Curators of Univ. of Missouri*,
    2009 WL 10705058 (W.D. Mo. Feb. 11, 2009) ...................................... 4, 50

*Allen v. City of Pocahontas, Ark.*,
    340 F.3d 551 (8th Cir.2003) ...................................................................... 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................... 19

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*,
    482 U.S. 569 (1987) ................................................................................... 19

*Beauharnais v. Illinois*,
    343 U.S. 250 (1952) ................................................................................... 36

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) ................................................................................... 41

*Bobo v. United Parcel Serv., Inc.*,
    665 F.3d 741 (6th Cir. 2012) ................................................................. 3, 32

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ................................................................................... 36

*Campbell v. Town of S. Pines*,
    2005 WL 1802405 (M.D.N.C. July 28, 2005) ......................................... 4, 52

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ..................................................................................... 45

*Clary v. City of Cape Girardeau*,
    165 F. Supp. 3d 808 (E.D. Mo. 2016) ...................................................... 48

Appellate Case: 19-1946    Page: 6    Date Filed: 09/05/2019 Entry ID: 4827248

*Coates v. City of Cincinnati,*
402 U.S. 611 (1971) ................................................................ 47

*Cohen v. San Bernardino Valley Coll.,*
92 F.3d 968 (9th Cir. 1996) ................................................ 4, 43-44

*Colautti v. Franklin,*
439 U.S. 379 (1979) ........................................................ 4, 47-48

*Corwin v. City of Indep., MO.,*
829 F.3d 695 (8th Cir. 2016) .................................................. 19

*Dambrot v. Cent. Michigan Univ.,*
55 F.3d 1177 (6th Cir. 1995) .................................................. 23

*Daugherty v. City of Maryland Heights,*
231 S.W.3d 814 (Mo. 2007) ................................................... 29

*DeAngelis v. El Paso Mun. Police Officers Ass'n,*
51 F.3d 591 (5th Cir.1995) ................................................... 37

*DeJohn v. Temple Univ.,*
537 F.3d 301 (3d Cir. 2008) .................................................. 23

*Doe v. Brown Univ.,*
166 F. Supp. 3d 177 (D.R.I. 2016) ............................................ 25

*Doe v. Columbia Univ.,*
831 F.3d 46 (2d Cir. 2016) ................................................. 2, 24

*Doe v. The Trustees of the Univ. of Pennsylvania,*
270 F. Supp. 3d 799 (E.D. Pa. 2017) ...................................... 2, 24-25

*Doe v. Univ. of Michigan,*
721 F. Supp. 852 (E.D. Mich. 1989) ........................................ 23, 27

*Doe v. Washington and Lee Univ.,*
No. 2015 WL 4647996 (W.D.Va. Aug. 5, 2015) ................................ 2, 28

*Fuller v. Rayburn,*
161 F.3d 516 (8th Cir. 1998) .................................................. 50

Appellate Case: 19-1946    Page: 7    Date Filed: 09/05/2019 Entry ID: 4827248

*Gates v. Georgia-Pac. Corp.,*
    492 F.2d 292 (9th Cir. 1974)............................................................. 52

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949)..................................................................... 36

*Gilooly v. Missouri Dep't of Health & Senior Servs.,*
    421 F.3d 734 (8th Cir. 2005)...................................................... 33-34

*Goyal v. Univ. of Minnesota,*
    2005 WL 2290281 (D. Minn. July 22, 2005)............................. 50-52

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)..................................................................... 43

*Halbrook v. Mallinckrodt, LLC,*
    888 F.3d 971 (8th Cir. 2018)....................................................... 19

*Hutson v. McDonnell Douglas Corp.,*
    63 F.3d 771 (8th Cir. 1995)........................................................ 52

*Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks,*
    864 F.3d 905 (8th Cir. 2017)....................................................... 20

*Keeney v. Hereford Concrete Prod., Inc.,*
    911 S.W. 2d 624 (Mo. 1995) ................................................. 2, 29

*Kodatt v. Oklahoma City Univ.,*
    2009 WL 10690873 (W.D. Okla. Nov. 25, 2009) ...................... 32

*Kolender v. Lawson,*
    461 U.S. 352 (1983)..................................................................... 47

*Lombardo v. Saint Louis City,*
    2018 WL 623588 (E.D. Mo. Jan. 30, 2018) ............................... 33

*Moore v. City of Charlotte, NC,*
    754 F.2d 1100 (4th Cir. 1985)..................................................... 52

Appellate Case: 19-1946    Page: 8    Date Filed: 09/05/2019 Entry ID: 4827248

*New York State Club Ass'n, Inc. v. City of New York*,
   487 U.S. 1 (1988)...................................................................... 20

*Paquin v. Fed. Nat. Mortg. Ass'n*,
   119 F.3d 23 (D.C. Cir. 1997) ................................................ 3, 32

*Pavlik v. Cargill, Inc.*,
   9 F.3d 710 (8th Cir. 1993) ......................................................... 30

*R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*,
   568 S.W.3d 420 (Mo. 2019) ................................................... 2, 27

*Rodgers v. Univ. of Mo. Bd. of Curators*,
   56 F. Supp. 3d 1037 (E.D. Mo. 2014) ................................... 49-50

*Roth v. United States*,
   354 U.S. 476 (1957)................................................................... 36

*Salau v. Denton*,
   139 F. Supp. 3d 989 (W.D. Mo. 2015) .................................. 3, 37

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) ........................................ 2-3, 23, 37-38

*Scheffler v. Molin*,
   743 F.3d 619 (8th Cir. 2014)..................................................... 35

*Stahl v. City of St. Louis, Mo.*,
   687 F.3d 1038 (8th Cir. 2012)................................................... 48

*State v. Vaughn*,
   366 S.W.3d 513 (Mo. 2012) ................................................. 2, 20

*Stephenson v. Davenport Cmty. Sch. Dist.*,
   110 F.3d 1303 (8th Cir. 1997)................................................ 4, 41

*Thompson v. Bd. of the Special Sch. Dist. No. 1*,
   144 F.3d 574 (8th Cir. 1998)..................................................... 50

*281 Care Committee v. Arneson*,
   638 F.3d 621 (8th Cir. 2011)................................................. 3, 34

Appellate Case: 19-1946     Page: 9     Date Filed: 09/05/2019 Entry ID: 4827248

*United States v. Barraza,*
    576 F.3d 798 (8th Cir. 2009). ....................................................... 40

*United States v. Cassidy,*
    814 F. Supp. 2d 574 (D. Md. 2011) ........................................... 3, 36-38

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000).................................................................... 37

*United States v. Stevens,*
    559 U.S. 460 (2010).................................................................... 36

*Vallejo v. Amgen, Inc.,*
    903 F.3d 733 (8th Cir. 2018)....................................................... 33

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982)................................................................ 40-41

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976).................................................................... 36

*Watts v. United States,*
    394 U.S. 705 (1969).................................................................... 36

*Yusuf v. Vassar Coll.,*
    35 F.3d 709 (2d Cir. 1994) ....................................................... 2, 24

## **Statutes**

18 U.S.C. § 2261A(2)(A) ................................................................. 38

28 U.S.C. § 1291............................................................................. 1

28 U.S.C. §§ 1331 .......................................................................... 1

Mo. Rev. Stat. § 213.010 ........................................................... 26-27

Mo. Rev. Stat. § 213.065 ........................................................... 26-27

Appellate Case: 19-1946   Page: 10   Date Filed: 09/05/2019 Entry ID: 4827248

Mo. Rev. Stat. § 565.002 ...................................................... 22

Mo. Rev. Stat. § 565.090 ...................................................... 21-22

**<u>Rules</u>**

Fed.R.Civ.P. 26(b) .............................................................. 50-51

CRR 200.010. .......................................................... *passim*

Appellate Case: 19-1946   Page: 11   Date Filed: 09/05/2019 Entry ID: 4827248

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 because at least one claim arises under federal law. Final judgment was entered on April 24, 2019, disposing of all claims between all parties. Appellant filed his notice of appeal on May 6, 2019. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

1

# STATEMENT OF ISSUES

1.      Whether Rowles stated a claim that the University's policies against sexual harassment and stalking are substantially overbroad.

*State v. Vaughn*, 366 S.W.3d 513, 521 (Mo. 2012)

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 202 (3d Cir. 2001)

   ***Discussed in Section I.B***


2.      Whether Rowles stated a claim that the University discriminated against him on the basis of sex in violation of Title IX.

*Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)

*Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 822 (E.D. Pa. 2017)

*Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)

   ***Discussed in Section I.C***


3.      Whether Rowles stated claims for race and sex discrimination in violation of the Missouri Human Rights Act.

*R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 424–25 (Mo. 2019)

*Doe v. Washington and Lee Univ.*, No. 2015 WL 4647996 (W.D.Va. Aug. 5, 2015)

*Keeney v. Hereford Concrete Prod., Inc.*, 911 S.W. 2d 622, 624 (Mo. 1995)

   ***Discussed in Section I.D***

Appellate Case: 19-1946    Page: 13    Date Filed: 09/05/2019 Entry ID: 4827248

4.      Whether the district court abused its discretion by denying Rowles's Motion to Compel disclosure of the factual basis for treating two white students less severely than Rowles for violating the same rules.

*Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 752 (6th Cir. 2012)

*Paquin v. Fed. Nat. Mortg. Ass'n*, 119 F.3d 23, 28 (D.C. Cir. 1997)

      ***Discussed in Section II.B***


5.      Whether the district court should have denied summary judgment to Defendants Hayes, Gallimore, Eardley, and Scroggs on Rowles's First Amendment retaliation claim.

*281 Care Committee v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011)

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001)

*United States v. Cassidy*, 814 F. Supp. 2d 574, 582 (D. Md. 2011)

*Salau v. Denton*, 139 F. Supp. 3d 989, 1009 (W.D. Mo. 2015)

      ***Discussed in Section III.B***

Appellate Case: 19-1946    Page: 14    Date Filed: 09/05/2019 Entry ID: 4827248

6. Whether the district court should have granted summary judgment to Rowles on his vagueness claim.

*Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997)

*Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 970–71 (9th Cir. 1996).

*Colautti v. Franklin*, 439 U.S. 379, 395 (1979)

**Discussed in Section III.C**


7. Whether the district court should have denied summary judgment to Defendants on Rowles's Title VI claim.

*Campbell v. Town of S. Pines*, 2005 WL 1802405, at \*13 (M.D.N.C. July 28, 2005)

*Ajiwoju v. Curators of Univ. of Missouri*, 2009 WL 10705058, (W.D. Mo. Feb. 11, 2009)

**Discussed in Section III.D**

Appellate Case: 19-1946   Page: 15   Date Filed: 09/05/2019 Entry ID: 4827248

# STATEMENT OF THE CASE

## A.    Rowles pursues a romantic relationship with A.B.

Rowles is an African American man and a former Ph.D. candidate at the University of Missouri ("University"). App. 317. A.B. is a white, female former undergraduate who worked at Kaldi's Coffee in Columbia and taught dance fitness classes at the University's Student Recreation Center ("Rec Center"). App. 320. Rowles met A.B. at Kaldi's in fall 2015 when she gave him a free drink token because his order had come out wrong. App. 333. Rowles subsequently enrolled in one of A.B.'s dance classes, and the two became friends. App. 333.

A.B. thought Rowles was gay until he asked her out after class the following spring. App. 332, 382. A.B. felt uncomfortable and told him she was "too busy this week." App. 332, 382. Rowles sent A.B. several flirtatious Facebook messages over the following week, App. 332-33, after which she responded:

> Jeremy, I really appreciate your feedback about my class and choreography, but these messages are getting excessive. I think our friendship needs to remain in the professional setting. Many of the things you say, like that Instagram comment for example, is over the top and I wouldn't be comfortable hanging out outside of my places of work. *I still want you to come to Tiger Tease and enjoy your time there*, but I need my space outside of class and I think a line has been crossed here.

App. 349 (emphasis added). Rowles immediately apologized for misreading their prior interactions:

Appellate Case: 19-1946    Page: 16    Date Filed: 09/05/2019 Entry ID: 4827248

> Oh my god, I am so sorry [A.B.]!! I thought… I am so
> sorry. I took our conversation last Tuesday as you agreeing
> to a date. I am so sorry, I read your reaction completely the
> wrong way. I feel so bad that I caused you to be
> uncomfortable, I really apologize.

App. 350. He continued attending A.B.'s classes, as she had indicated he could, but he stopped sending her flirtatious Facebook messages. App. 332.

In September 2016, Rowles emailed A.B. about developing his contemporary dance skills, and A.B. suggested he take private lessons. App. 332. Unable to sign up for private lessons through the Rec Center, Rowles eventually asked A.B. if he could take lessons from her, but she said she did not teach private lessons. App. 332. On October 7, Rowles tried unsuccessfully to talk with A.B. after class. App. 333. He gave her co-instructor a note for A.B. containing the song lyrics, "Take me back to the start," and the Kaldi's drink token she had given him a year earlier. App. 359. A.B. thought the note was "bizarre." App. 333. After class on October 14, Rowles handed A.B. a three-page letter after class that "contained apologies and a confession of 'love' for" her. App. 332. The letter made A.B. "extremely uncomfortable." App. 382.

## B.    The Title IX Office suspends Rowles for sexual harassment and stalking.

A.B. showed the letter to Rec Center Associate Director Emily Bach McElwaine, who promptly emailed the University's Office for Civil Rights and Title IX ("Title IX"). App. 384. McElwain's email accused Rowles of pursuing romantic relationships with three other instructors in addition to A.B.: Rose Nash, Ashlyn Balch, and Hannah Turnbull. App. 384. A.B. submitted a formal complaint to Title IX

6

on October 21. App. 406, 416. Investigator Amber Lammers sent Rowles a "Notice of Investigation of Potential Sex Discrimination" on November 7, stating that he may have violated sections 200.010.C.7.b-d of the University's Collected Rules and Regulations ("CRR"), which provide in pertinent part:

> **200.010.C. Conduct** for which students and student organizations, when applicable, are subject to sanctions falls into the following categories:
>
> . . .
>
> 7. **Violation of the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/ Employment Policy in Section 600.020 of the Collected Rules and Regulations.** These violations include:
>
> . . .
>
> b. **Sexual Harassment.** Sexual harassment is defined as:
>   1) Unwelcome sexual advances or requests for sexual activity by a person or persons in a position of power or authority to another person, or
>   2) Other unwelcome verbal or physical conduct of a sexual nature by a person to another person, when:
>     a) Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions; or
>     b) Such conduct creates a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies the ability of an individual to participate in or benefit from educational programs or activities or employment access, benefits or opportunities.
>
> …
>
> d. **Stalking on the Basis of Sex.** Stalking on the basis of sex is following or engaging in a course of conduct on the basis of sex with no legitimate

7

> purpose that puts another person reasonably in fear
> for his or her safety or would cause a reasonable
> person under the circumstances to be frightened,
> intimidated or emotionally distressed.

App. 387-88.

In her formal complaint and her conversations with Lammers, A.B. never alleged that Rowles touched her inappropriately or threatened her with violence. App. 407, 411-12. She never said she was afraid of Rowles or that he made her feel intimidated. App. 405. A.B. told Lammers, "[Rowles] has an inability to read social cues," that his behavior was "not necessarily malicious," and that he "didn't understand that things were over, and that we couldn't be friends." App. 335. Lammers attempted to interview Balch, Nash, and Turnbull, but they did not call her back. App. 380. Lammers prepared a 55-page investigative report for review by Defendant Ellen Eardley, ("Eardley"), who was then the Assistant Vice Provost for Civil Rights and Title IX. App. 327.

Title IX had investigated Rowles once before. App. 322-23. In September 2015, a female undergraduate alleged that Rowles, who was her Teaching Assistant, insinuated he would provide exam questions for sexual favors. App. 322. At one point during the investigation, Defendant Salama Gallimore—the lead investigator—told Rowles he "looked like someone who might commit sexual assault." App. 32-33. Notwithstanding Gallimore's opinion of Rowles's appearance, Senior Associate

8

Provost Ken Dean ultimately determined that Rowles had *not* violated the University's

sexual harassment policy; however, he noted that the complainant

> was not unreasonable to have inferred, as a subjective
> belief, that your behavior indicated sexual favors were
> sought. However, you never directly indicated that your
> offer to show her the exam was conditioned on sexual
> favors. None of the evidence or statements contained
> within the Investigative Report indicated that you
> requested, or hinted that you desired sexual favors in
> exchange for showing [the Complainant] the exam.

App. 323.

On March 15, 2017, Eardley issued her "Informal Resolution Findings by the

Administrative Officer," finding

> [t]he letter [Rowles gave A.B.] and the sentiments
> contained within were unwelcome to [A.B.]. This made
> [her] extremely uncomfortable in her place of work, even
> more so because she had directly communicated to him in
> writing that his previous behavior had crossed the line and
> that she would not be comfortable spending time with him
> outside her employment.

App. 319, 321. Eardley concluded that Rowles had violated the University's sexual

harassment policy:

> In April 2016, [A.B.], an undergraduate student, directly
> informed [Rowles], a doctoral candidate, that his
> communications towards her were unwelcome,
> unprofessional and crossed the line. After learning that his
> behavior made [A.B.] uncomfortable, [Rowles] chose to
> attend AB's TigerX classes multiple times each week, stare
> at her, make efforts to speak with her, and make efforts to
> be near her. He then requested to take private classes with
> her, left a token for her, and then wrote a three-page letter
> describing his very detailed romantic feelings. From an

9

> objective standard, such conduct is unwelcome and hostile.
> It is also pervasive in that it lasted over the course of
> several months.

App. 322. Eardley further concluded Rowles had violated the University's stalking

policy because his conduct constituted "a course of conduct towards [A.B.] that

would cause a reasonable person under the circumstances to be frightened,

intimidated or emotionally distressed." App. 322. Eardley never found that Rowles

posed any danger of physical or sexual assault. App. 407-08.

Referring to his prior Title IX investigation—in which Rowles was *cleared* of

sexual harassment—Eardley opined that "[Rowles] does not appear to set appropriate

professional boundaries with undergraduate students in workplace environments

throughout campus—whether in academic settings or at the Rec Center." App. 322.

She found it "concerning that [Rowles] failed to learn from Mr. Dean and the

Department Chair's previous warning regarding his conduct with an undergraduate

female student." App. 323. Eardley suspended Rowles from all four University

campuses for four years and permanently banned him from the University's residence

halls and the Rec Center. App. 323-24.

Rowles appealed to Defendant Cathy Scroggs, the Vice Chancellor for Student

Affairs. App. 390-93. Scroggs upheld Eardley's findings but cut his suspension in half:

> I acknowledge that you do not have a record of previous
> discipline. I also have considered the arguments presented
> in the appeal concerning the severity of the conduct and
> explanations of your actions. Further, I have considered
> whether the record indicates that there is a need for a four

year suspension to end or remedy the effects of the discrimination or harassment, or prevent its future recurrence.

Based on those factors, and with due deference to the original decision, I conclude that there is compelling justification to modify the sanction to the following extent: Instead of a four-year suspension, you will be suspended from the University of Missouri, including all four campuses, to run through the end of summer session 2019. All other sanctions of the original decision shall remain unchanged.

App. 396.

## C. White students found responsible for sexual harassment, stalking, *and sexual assault* receive less punishment than Rowles.

Rowles filed this lawsuit alleging that Title IX violated his civil rights. In discovery, he asked Defendants to "[i]dentify each complaint of sexual harassment or stalking based on sex (as those terms are defined in the University's Collected Rules and Regulations) filed with the University's Title IX Office during the five-year period from July 1, 2012 through June 30, 2017. App. 585-86 For each complaint identified, Rowles asked Defendants to state:

      a.  the date of the complaint;
      b.  the provision of the CRRs allegedly violated,
      c.  the race and sex of the complaining party;
      d.  the race and sex of the party accused;
      e.  the name of the primary investigator;
      f.  whether the Title IX Office substantiated the violation; and
      g.  the sanction imposed (if any).

Appellate Case: 19-1946    Page: 22    Date Filed: 09/05/2019 Entry ID: 4827248

He also asked Defendants to produce "all reports, data collections, or other documents showing the race and sex of persons accused of sexual harassment or stalking based on sex (as those terms are defined in the University's Collected Rules and Regulations) during the five-year period from July 1, 2012 through June 30, 2017." App. 585-86. In response, Andrea Hayes, the current Vice Chancellor for Civil Rights and Title IX, provided summary information regarding 60 complaints investigated by Title IX between August 2014 and March 2017. Hayes identified the race of the accused, the regulation allegedly violated, and the discipline imposed but no description of the conduct alleged or the race of the accuser. App. 595-610. She did not produce any documents related to the 60 complaints.

The summary information Hayes provided shows significantly disparate punishment by Title IX based the race of the accused. For example, of the 60 complaints identified, only two other students—both white—violated the same rules as Rowles. The first white student found responsible for both harassment and stalking, identified as "Complaint No. 22," received *no suspension*. App. 588-89. The second white student found responsible for both harassment and stalking, identified as "Complaint No. 24," was *also* found responsible for "Non-Consensual Sexual Contact," and "Non-Consensual Sexual Intercourse," and "threatening or intimidating behaviors." He was suspended for just *six months*. Rowles, the subject of Complaint No. 53 and the only African American found responsible for both sexual harassment and stalking, was suspended for *two years*. App. 588-89. Nothing in Hayes's

12

interrogatory responses explains why Rowles was suspended *four-times longer* than a white student who was *also* found responsible sexual assault.

## D. Defendants withhold information necessary to determine whether Rowles was similarly situated to white students who received lesser punishment for more serious violations.

Rowles moved to compel production of (1) the formal complaint filed with the Title IX Office, (2) the Investigative Report prepared by the Title IX Investigator (without attachments), and (3) the final written decision of the Title IX Office for each of the 60 complaints. The documents requested are not particularly voluminous for a federal discrimination lawsuit. By way of comparison, the complaint against Rowles was two pages; the Investigative Report was 55 pages; and the Informal Resolution Findings was eight pages—a total of 65 pages. Assuming the same documents for each of the other 59 complaints are of comparable volume, Rowles was seeking fewer than 3,600 pages. More importantly, the documents must have been gathered by defense counsel already to prepare Hayes's interrogatory responses. If that request was deemed not to be proportional to the needs of the cases, Rowles asked that Defendants be required to produce the complaints and final decisions for the 31 male students found responsible for sex- or gender-based misconduct—*a total of only 300 pages.*

Denying Rowles's motion to compel, the district court concluded:

> to the extent Plaintiff would seek to present evidence of comparators to the factfinder without statistical support, Plaintiff would first need to establish that the comparators

13

> relied upon represent comparable circumstances. To the
> extent Plaintiff argues the requested production is
> necessary before he can assess whether the potential
> comparators are similarly-situated to Plaintiff, *Defendants
> represent they have produced what Plaintiff needs to make such an
> assessment.*

App. 280 (emphasis added). However, Hayes later testified that she could not explain

why the two white students found responsible for sexual harassment and stalking

(Complaint Nos. 22 and 24) received more lenient sanctions than Rowles without

reviewing the specific complaints in those cases. App. 422. Eardley and Gallimore

also testified they would need to review the underlying case files to explain why the

two white students received more lenient sanctions than Rowles. App. 408-09, 417.

The only difference Scroggs could identify between Rowles and the two white

students, without reviewing the actual complaints, was the identity of the investigator

*and the race of the accused.* App. 417-18.

**E.      Defendants disagree among themselves about the meaning of the
         University's sexual harassment and stalking policies.**

The individual Defendants have also given conflicting testimony about the

scope and enforcement of the University's sexual harassment and stalking policies.

Scroggs testified that asking someone out on a date is a "sexual advance" within the

meaning of the harassment policy, CRR 200.010.C.7.b.1. App. 413-14. She also

believes that a man asking out a physically smaller woman qualifies as a "position of

power or authority" within the meaning of the policy. App. 413. Hayes agrees with

Scroggs that a man's physical size alone is enough to bring him within the ambit of

14

the sexual harassment policy. App. 305-06. By contrast, Gallimore believes that the phrase "power or authority" requires the accused to have "some sort of evaluative or supervisory capacity" over his accuser. App. 424. She believes the harassment policy does not generally apply to sexual advances between fellow students. App. 424.

Eardley testified that the phrase "severe or pervasive and objectively hostile" as used in the stalking policy, CRR 200.010.C.7.b.2.b, has two distinct requirements: (1) *either* severe or pervasive, *and* (2) objectively offensive. App. 399-400. By contrast, Scroggs testified that the phrase "severe or pervasive and objectively offensive" is a disjunctive list in which only one of the three elements must be satisfied. App. 414. Gallimore interprets the phrase to require only some interference with one's ability to participate or benefit from educational programs. App. 425.

According to Eardley, the meaning of "no legitimate purpose" depends on what "the university community would expect" in any given set of circumstances. App. 400-01. Although she testified that "no legitimate purpose" may mean something different when applied to graduate students as opposed to undergraduates, Eardley conceded that University's rules do not distinguish between classes of students. App. 401-02. Scroggs defined "no legitimate purpose" as unwanted by the object of the verbal or physical conduct. App. 414-15. Hayes testified, "I don't know that there is a definition specifically for legitimate. I think you can't dissect it by that individual word. I think you have to look at the sentence as a whole and the facts of the whole entire situation." App. 420. Unable to explain how students are supposed to

15

determine whether they have a "legitimate purpose" in asking someone out, Hayes suggested that concerned students call Title IX for clarification. App. 419. However, she could not guaranty that such callers would hear the same interpretation of the rules from different members of her staff. App. 420.

Hayes testified that "emotionally distressed" means any negative feeling at all, including "upset," "angry," "sad," "uncomfortable" or even "annoyed." App. 421. Eardley testified that it means "a state of emotional discomfort." App. 403. Scroggs testified that the "emotional distressed" prong "could just be more of amplification of the fear and distress or the fear and intimidation so they -- they have emotional outbursts as a result of that." App. 415.

Appellate Case: 19-1946    Page: 27    Date Filed: 09/05/2019 Entry ID: 4827248

## SUMMARY OF THE ARGUMENT

The district court erroneously dismissed Rowles's claims for substantial overbreadth (Count II), sex discrimination in violation of Title IX (Count VII), and and race and sex discrimination in violation of the Missouri Human Rights Act ("MHRA") (Counts VIII and IX). The overbreadth claims should not have been dismissed because the University's policies on sexual harassment and stalking on the basis of sex prohibit a substantial range of non-threatening protected speech. The Title IX and MHRA sex-discrimination claims should not have been dismissed because Rowles pleaded facts showing that the University selectively enforced its policies against him based on his sex because a Title IX investigator thought he "looked like someone who might commit sexual assault." The MHRA race-discrimination claim should not have been dismissed because Rowles alleged that the University's Title IX Office punishes black students more harshly than white students, especially if the complaining witness is white. Discovery related to Rowles's federal race discrimination claim—which the court did not dismiss even though its protections are narrower than that MHRA—uncovered specific examples of white students given much lighter punishments for the same (or more serious) rules violations.

The court abused its discretion in denying Rowles's motion to compel production of the formal complaints submitted to, the investigative reports created by, and the final determinations of the Title IX Office involving allegations similar to

17

those made against Rowles. The files were necessary to determine the extent to which white students disciplined far more leniently for violating the same rules as Rowles are similarly situated comparators. Defendants represented that they had already produced all the information necessary to determine whether the other students were, in fact, similarly situated. In their depositions, however, *every* Defendant testified that she would need to look at the actual case files to explain why white students violating the same rules as Rowles were treated more favorably. Nonetheless, Defendants then argued at summary judgment that Rowles had failed to produce evidence that the white students who received lesser punishments were similarly situated.

The district court erred in granting summary judgment to Defendants on Rowles's claims for First Amendment retaliation (Count I), vagueness (Count III), and race discrimination in violation of Title VI (Count VI). The court also erred in denying summary judgment to Rowles on the vagueness claim. Rowles produced evidence that Defendants suspended him for engaging in protected speech and that his suspension was four times longer than a white student for violating the same rules even though the white student also committed *sexual assault*. Rowles was entitled to judgment as a matter of law on his vagueness challenge because even the Defendants responsible for enforcing the University's sexual harassment and stalking policies cannot agree among themselves on what the policies mean and what conduct they prohibit.

18

# ARGUMENT

I. **The district court erred in dismissing Rowles's claims for substantial overbreadth, sex discrimination in violation of Title IX and the Missouri Human Rights Act ("MHRA"), and race discrimination in violation of the MHRA.**

### A. Standard of Review

This Court reviews rulings on motions to dismiss *de novo*, *Halbrook v. Mallinckrodt, LLC*, 888 F.3d 971, 975 (8th Cir. 2018), and "accept[s] as true all facts pleaded by the non-moving party and grant[s] all reasonable inferences from the pleadings in favor of the non-moving party." *Corwin v. City of Indep., MO.*, 829 F.3d 695, 699 (8th Cir. 2016). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (internal quotation marks omitted).

### B. Rowles stated a claim that the University's sexual harassment and stalking policies are substantially overbroad.

In Count II of his Amended Complaint, Rowles alleged the University's sexual harassment and stalking policies are unconstitutionally overbroad in their prohibition against non-threatening speech. "Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court – those who desire to engage in legally-protected expression but who may refrain from doing so rather than risk prosecution….' " *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987). "[T]he overbreadth of an ordinance affecting both

19

conduct and pure speech must be both real and substantial in relation to its plainly legitimate sweep." *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 912 (8th Cir. 2017) (internal citations omitted). To find a statute substantially overbroad, a court must find a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988).

The district court found Rowles's overbreadth challenge to the University's sexual harassment policy "unavailing" because it "prohibits the same type of conduct that Missouri law prohibits" in the workplace. App. 183. Similarly, the court found the University's stalking policy "uses language similar to that used in Missouri statutes prohibiting stalking." *Id.* The court then noted that the terms common to University policy and state law, such as "frighten, intimidate, and emotional distress, are each common words in usage, definition, and understanding." *Id.* Thus, the court concluded, "Plaintiff has not plausibly alleged that the university policies at issue have a real and substantial deterrent effect on protected speech." *Id.* at 183-84

The district court's overbreadth analysis is flawed in several respects. First, that university policy and state law happen to use similar language does not resolve the overbreadth question unless the supposedly analogous state law has been upheld against an overbreadth challenge. However, the only overbreadth case cited by the district court actually contradicts its ruling. In *State v. Vaughn*, 366 S.W.3d 513, 521

Appellate Case: 19-1946     Page: 31     Date Filed: 09/05/2019 Entry ID: 4827248

(Mo. 2012), the Missouri Supreme Court considered an overbreadth challenge to Mo.

Rev. Stat. §§ 565.090.1(5) and (6), which provided:

> 565.090. 1. A person commits the offense of harassment in the first degree if he or she: . . .
>
> (5) Knowingly makes repeated unwanted *communication* to another person; or
>
> (6) Without good cause engages in *any other act* with the purpose to frighten, intimidate, or cause emotional distress to another person, cause such person to be frightened, intimidated, or emotionally distressed….

Mo. Rev. Stat. §§ 565.090.1 (2012) (emphasis added). The Court invalidated

subsection (5) as unconstitutionally overbroad but upheld subsection (6). *Vaughn*, 366

S.W.3d at 520-521. The difference between the two is that subsection (5) prohibited

unwanted *communication* whereas subsection (6) prohibited "*any other act* with the

purpose to frighten, intimidate, or cause emotional distress." *Id.* (emphasis added).

The former violated the First Amendment because "the public *expression of ideas* may

not be prohibited merely because the ideas are themselves offensive to some of their

hearers." *Id.* at 520 (emphasis added). By contrast, the latter passed constitutional

muster because it "punishes *actions* which by their very occurrence inflict injury or

tend to incite an immediate breach of the peace. Such activity is unprotected by the

First Amendment." *Id.* at 521 (emphasis added). Unlike Mo. Rev. Stat. §§ 565.090.1(6)

(2012), which was limited to *non-expressive conduct*, the University's sexual harassment

policy applies to "unwelcome *verbal* or physical *conduct of a sexual nature*." CRR

21

200.010.C.7.b. (emphasis added). To the extent this policy is used to punish *expression*—the crux of Rowles's claim—it is similar to Mo. Rev. Stat. §§ 565.090.1(5), which was struck down as substantially overbroad.

Similarly, Missouri's statutory crime of stalking is far more limited than the University's regulation:

> A person commits the offense of stalking … if he or she purposely, through his or her course of conduct, disturbs … another person **and**: (1) Makes a threat communicated with the intent to cause the person … to reasonably fear for his or her safety…; (2) … violat[es] an order of protection … or (3) violat[es] a condition of probation….

Mo. Rev. Stat. § 465.225.1(2) (emphasis added). Moreover, "[c]onstitutionally protected activity is not included within the meaning of course of conduct" within the stalking statute. Mo. Rev. Stat. § 565.002(4). To be convicted of stalking, a person must engage in a "course of conduct" *other than* "constitutionally protected activity" that disturbs another person, *plus* he must either communicate a *threat with the intent to cause fear* or violate an order of protection or a condition of probation. By contrast, University policy prohibits even constitutionally protected non-threatening speech of a sexual nature as long as it has "no legitimate purpose" and (even unintentionally) causes another "to be frightened, intimidated or emotionally distressed." CRR 200.010.

Both regulations are also unconstitutionally overbroad because they facially prohibit otherwise protected speech based on the affect such speech has on its

22

audience. For example, imagine a group of students protests a guest lecture on gay rights by carrying signs reading "GOD HATES FAGS." For many students attending the lecture, this protest includes "unwelcome verbal … conduct of a sexual nature [that] creates a hostile environment by being sufficiently severe … and objectively offensive that it interferes with … the ability of an individual to … benefit from educational programs …." CRR 200.010. For gay students attending the lecture, the protest could also be "a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." CRR 200.010. If a student could be expelled for "sexual harassment" or "stalking on the basis of sex" by engaging in fully protected (if repugnant) speech in a public forum, the definitions of those terms are substantially overbroad.[1] The district court's order dismissing Count II should be reversed.

---

[1] *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008) (finding University harassment policy overbroad); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 202 (3d Cir. 2001) (invalidating as overbroad a college policy defining harassment as "verbal … conduct based on one's actual or perceived … gender … which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment"); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995) (invalidating as overbroad a university's rule against "verbal … behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by … demeaning or slurring individuals … because of their racial or ethnic affiliation; or using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation."); *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 856 (E.D. Mich. 1989) (invalidating as overbroad university prohibition against "Any behavior, verbal or physical, that stigmatizes or victimizes an individual on the basis

23

**C.    Rowles stated a claim that the University discriminated against him on the basis of sex in violation of Title IX.**

In Count VII of his Amended Complaint, Rowles alleged that the University discriminated against him on the basis of his sex in violation of federal law. Title IX "bar[s] the imposition of university discipline where gender is a motivating factor." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016). Title IX cases fall within one of two categories: "erroneous outcome" and "selective enforcement." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 822 (E.D. Pa. 2017). Under an erroneous outcome theory, a plaintiff must allege "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Doe v. Univ. of Pennsylvania*, 270 F. Supp. 3d at 822–23. "The pleading burden in this regard is not heavy." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). In a selective enforcement case, the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. To state a selective enforcement claim, a male plaintiff must allege "that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [educational institution]," and must also allege "particular circumstances suggesting that gender bias was a motivating factor behind the inconsistency." *Doe v. Univ. of Pennsylvania*, 270

---

of … sexual orientation … and that … Creates an intimidating, hostile, or demeaning environment for educational pursuits, employment or participation in University sponsored extra-curricular activities").

Appellate Case: 19-1946    Page: 35    Date Filed: 09/05/2019 Entry ID: 4827248

F. Supp. 3d at 824. However, "[r]equiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts." *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016).

Rowles stated a Title IX claim under both theories. First, Rowles alleged that Defendants erroneously concluded he had sexually harassed and stalked A.B. and that his gender motivated the erroneous result. A.B. did not claim Rowles intimidated, threatened, stalked, or touched her inappropriately—only that his "bizarre" behavior made her feel "uncomfortable." App. 71-72. Title IX investigators never interviewed the other three women Rowles allegedly harassed, relying instead on double hearsay reported by an administrator at the Rec Center. App. 33. Gallimore's comment during the earlier, unsubstantiated investigation that Rowles "looks like someone who might commit sexual assault" suggests a bias against large men. App. 32. These allegations support a reasonable inference that Rowles would not have been found responsible based on the same conduct if he didn't "look like someone who might commit sexual assault."

Second, Rowles alleged that Defendants enforced the University's regulations far more severely against him than they would have against a female student accused of similar conduct. During Rowles's investigation, Title IX gave preferential treatment to A.B.: Rowles received only three days to choose between formal and informal

25

resolution, whereas A.B. was not given a deadline, took six days to respond, and was told she could have an advisor of her choice help her chose between resolution processes. App. 34-35. While Rowles did not plead the names of specific women treated less severely for engaging in similar conduct, he did allege that "Curators have exclusive possession and control of records showing the disparate outcome of disciplinary proceedings involving similarly situated male and female students, and they deliberately conceal such information from the public." App. 73. Indeed, discovery for other claims in this case revealed that allegations against men are treated differently from allegations against women. Scroggs testified in her deposition that a man asking out a woman who is physically smaller than himself qualifies as a "power or authority" within the meaning of CRR 200.010.C.7.b.1. App. 413. Defendant Hayes agreed, testifying in her deposition that a man's physical size is sufficient to bring him within the ambit of the sexual harassment policy. App. 305-06.

Granting all reasonable inferences in his favor, Rowles stated a claim under Title IX. The district court's dismissal of Count VII should be reversed.

**D.  Rowles stated claims for race and sex discrimination under the Missouri Human Rights Act.**

In Counts VIII and IX, Rowles alleged the University discriminated against him on the bases of race and sex, respectively, in violation of the Missouri Human Rights Act ("MHRA"). To state a claim for public accommodations discrimination under the MHRA, a plaintiff must allege: "(1) plaintiff is a member of a class protected by

26

section 213.065; (2) plaintiff was discriminated against in the use of a public accommodation (as defined by section 213.010); and (3) plaintiff's status as a member of a protected class was a *contributing factor* in that discrimination." *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 424–25 (Mo. 2019), reh'g denied (Apr. 2, 2019) (emphasis added).

Rowles pleaded facts from which a reasonable juror could infer that his race and his sex at least *contributed* to his disproportionate punishment. He alleged that he is black male student suspended from the University for writing a letter expressing his feelings to a white female student. App. 21. Rowles alleged that Defendant Gallimore made a racially and sexually charged statement that he "looked like someone who might commit sexual assault." App. 32-33. He alleged that even though a prior complaint was ultimately unsubstantiated, Eardley relied on that *allegation* to find that Rowles "does not appear to set appropriate boundaries with undergraduate students" and that he had "failed to learn from [his] previous warning regarding his conduct with an undergraduate female student." App. 24, 38. He alleged that Defendant Scroggs found a "distinct common thread" between the prior unsubstantiated allegation by a white female undergraduate and the current allegation from another white female undergraduate. App. 41.[2]

---

[2] *See also, supra*, Section I.C for more discussion of the ways in which Rowles alleged he was treated differently by Defendants due to his sex.

27

Rowles further alleged that the University has a history of racial discrimination and unfair treatment of African American students, App. 41-42; that minority students are punished at substantially higher rates throughout every other level of education in the United States, App. 42-43; that the differential treatment is even more pronounced in cases with ill-defined violations, *id.*; that a law professor at the University has written, "it would be a miracle if university disciplinary procedures did not produce outcomes that excessively punish black students, along with members of other disadvantaged minority groups," App. 45; that investigations at other universities have uncovered racial bias in student discipline offices, App. 45-46; and that the University has "made a deliberate choice not to collect demographic information about students and faculty accused of or disciplined for violating Title IX in order to conceal the disproportionate rate at which the University investigates and disciplines male students and students of color," App. 27. *See Doe v. Washington and Lee Univ.*, No. 6:14–CV–00052, 2015 WL 4647996, at *10 (W.D.Va. Aug. 5, 2015) (denying motion to dismiss where plaintiff alleged decision-maker exhibited gender bias in an article "posit[ing] that sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations that she did not outwardly express").

The district court acknowledged that "Plaintiff broadly alleges claims of race and sex discrimination, which is generally sufficient under the MHRA…." *Id.* Nonetheless, the court ruled that "Plaintiff's complaint does not contain sufficient

factual material from which the reasonable inference can be drawn that Defendants are liable for the misconduct alleged." Order at 25. The district court relied on *Keeney v. Hereford Concrete Prod., Inc.*, 911 S.W. 2d 622, 624 (Mo. 1995), for reasons that are not clear. *Keeney* reversed a trial court's dismissal of an MHRA claim because the lower court "erroneously impose[d] federal interpretations of [Title VII] on [the MHRA]." 911 S.W.2d at 625.

The court's dismissal of Rowles's *state* law race discrimination claim under the MHRA is particularly perplexing given the court's refusal to dismiss Rowles's *federal* race discrimination claim under Title VI. As noted in *Keeney*, "the language employed by the Congress [in the federal anti-discrimination statutes] is considerably more limited than the exceedingly broad "in any manner against any other person" language adopted by the Missouri legislature" in the MHRA *Id.* at 624. "Indeed, the difference in the language employed by the two statutes is sufficiently stark to render judicial interpretations of the federal law inapposite for purposes of assigning meaning to [the MHRA]." *Id.* It does not make any sense that Rowles could have stated a claim for race discrimination under Title VI but not under the MHRA. *See Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 819–20 (Mo. 2007) (superseded by legislation in 2017) (distinguishing between Title VII, under which plaintiff's protected class must have "motivated" the discriminatory conduct, and the MHRA, which only requires plaintiff to show his protected class was a "contributing factor").

29

Because Rowles pleaded facts from which a reasonable juror could infer that his race and sex "contributed" to Defendants' discriminatory conduct, the district court erred in dismissing Rowles's MHRA claims.

## II. The district court abused its discretion by denying Rowles's motion to compel disclosure of the circumstances in which two white students were punished less harshly for the same or more serious rules violations.

### A. Standard of Review

"The trial court has broad discretion to decide discovery motions and [the Eighth Circuit] will not disturb such a ruling absent a gross abuse of discretion affecting the fundamental fairness of the trial." *Pavlik v. Cargill, Inc.*, 9 F.3d 710, 714 (8th Cir. 1993).

### B. The University's purported bases for treating white students differently for violating the same rules is discoverable and its disclosure should have been compelled.

Rowles alleged "the sanctions imposed on African-American students by the University's Title IX Office are substantially more severe than those imposed on white students accused of similar conduct." App. 50. Hayes's interrogatory responses supported Rowles's allegations: only two other students—both white—were found responsible for sexual harassment *and* stalking on the basis of sex, the same rule violations for which Rowles received a two-year suspension. One of the white students was ordered to attend counseling but was not suspended. The other white student—*who was also found responsible for sexual assault*—was suspended for just six months. Defendants' interrogatory responses did not explain why Rowles was

30

suspended *four-times longer* for writing a love letter than a white student who committed sexual assault.

Rowles moved to compel production of (1) the formal complaints filed with the Title IX Office, (2) the Investigative Report prepared by the Title IX Investigator (without attachments), and (3) the final written decision of the Title IX Office for some subset of the 60 complaints. The district court denied the motion, noting: "To the extent Plaintiff argues the requested production is necessary before he can assess whether the potential comparators are similarly-situated to Plaintiff, *Defendants represent they have produced what Plaintiff needs to make such an assessment*." App. 280-81 (emphasis added). Contrary to that representation, all four individual Defendants later admitted that the summary information provided in Hayes's interrogatory responses was *not* sufficient to explain the disparate punishments imposed on Rowles and the two white students. Hayes testified, "I'd have to know more information." App. 422. Eardley testified that she "would need to know additional information to know whether [the two white students] are in fact similarly situated to Mr. Rowles." App. 408-09. Scroggs testified she "would need to know the facts of those cases to be able to compare them." App. 417-18. Similarly, Gallimore responded: "I would need to know what they were found responsible of so that I could answer your question because right now you're asking me to compare things when I don't know which one of these charges they were found responsible for, so it's not a comparison that can be made." App. 426.

31

The district court committed a gross abuse of discretion in denying Rowles's motion to compel production of *any* of the requested documents. At the very least, the actual complaints and rulings against two white students punished for the same or more serious violations than Rowles were *relevant* to Rowles's race discrimination claims. As Defendants conceded in their depositions, they would have to know the underlying facts of those two complaints to determine whether Rowles's harsher punishment was based on race or some other distinction. *See, e.g., Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 752 (6th Cir. 2012) ("by limiting discovery on other potential comparators, the district court improperly narrowed Federal Rule of Civil Procedure 26(b)(1)); *Paquin v. Fed. Nat. Mortg. Ass'n*, 119 F.3d 23, 28 (D.C. Cir. 1997) (defendants' production of numerical ratings for 32 other executives at same level as plaintiff was insufficient because plaintiff "needs the underlying narrative evaluations of the executives"); *Kodatt v. Oklahoma City Univ.*, No. CIV-08-477-R, 2009 WL 10690873, at *1 (W.D. Okla. Nov. 25, 2009) (compelling production of redacted documents showing similarly situated students were treated differently).

Rowles' discovery request was also *proportional* to the needs of the case. Although he originally sought approximately 3,600 pages of documents, he offered to harrow his request to just the 30 complaints and final determinations involving sexual harassment or stalking—approximately 300 pages. As Defendants must have gathered those files already to compile their interrogatory responses, there would have been little additional cost in producing them to Rowles. "A party claiming requests are

32

unduly burdensome cannot make conclusory allegations, but must provide some evidence regarding the time or expense required." *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 743 (8th Cir. 2018).

Most importantly, the University has exclusive possession of the relevant documents, and Rowles had no other means of obtaining the information contained within them. *See Lombardo v. Saint Louis City*, No. 4:16-CV-01637-NCC, 2018 WL 623588, at *2 (E.D. Mo. Jan. 30, 2018) ("Plaintiff cannot access this information in any other reasonable manner and the City cannot show that the request is unduly burdensome"). The University does not disclose any demographic information about its Title IX investigations or the discipline it imposes on students. No one outside the University has the ability to determine whether racial bias affects Title IX Investigations and leads to harsher discipline for African American students. The district court's failure to compel production of the relevant information was a gross abuse of discretion.

## III. The district court erred in granting summary judgment to Defendants on Rowles's claims for First Amendment retaliation, vagueness, and race discrimination in violation of Title VI.

### A. Standard of Review

This Court reviews summary judgment rulings *de novo. Allen v. City of Pocahontas, Ark.*, 340 F.3d 551, 554–55 (8th Cir. 2003). In reviewing the judgment of the district court, this Court views all evidence "in the light most favorable to the nonmoving

Appellate Case: 19-1946     Page: 44     Date Filed: 09/05/2019 Entry ID: 4827248

party." *Gilooly v. Missouri Dep't of Health & Senior Servs.*, 421 F.3d 734, 738 (8th Cir. 2005).

### B. Genuine issues of material fact precluded summary judgment on Rowles's First Amendment retaliation claim.

In Count I, Rowles sued Defendants Gallimore, Eardley, and Scroggs in their individual capacities and Defendant Hayes in her official capacity for retaliation based on his exercise of First Amendment rights. The district court granted summary judgment to Gallimore based on lack of personal involvement, to Eardley and Scroggs based on qualified immunity, and to Hayes based on Eleventh Amendment immunity. The rulings in favor of Eardley, Scroggs, and Hayes should be reversed.[3]

### 1. Hayes is not entitled to Eleventh Amendment immunity when sued for prospective injunctive relief.

The district court granted summary judgment to Hayes on Count I based on its erroneous conclusion that the Eleventh Amendment bars *all* claims against state actors in their official capacity. App. 578. The court was correct that the Eleventh Amendment bars official capacity claims for *damages*. However, "[u]nder the *Ex parte Young* doctrine, a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *281 Care Committee v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011). In this case, Rowles sued Hayes in her official capacity as the current Vice Chancellor for Civil Rights and Title IX, seeking an injunction

---

[3] Rowles does not challenge summary judgment in favor of Gallimore on Count I, or the denial of his own motion for summary judgment on Count I.

Appellate Case: 19-1946    Page: 45    Date Filed: 09/05/2019 Entry ID: 4827248

"ordering the University to reinstate Rowles as a full-time doctoral candidate in good standing with the Department of Cultural Anthropology" and "prohibiting enforcement of the University's sexual harassment and stalking rules to the extent they are void for vagueness or substantially overbroad." App. 76-77. Because Rowles seeks only prospective injunctive relief against Hayes in her official capacity, she is not entitled to Eleventh Amendment Immunity.

### 2. Rowles raised a genuine dispute of material fact whether Eardley and Scroggs took adverse action against him for engaging in protected speech.

Granting summary judgment to Eardley and Scroggs, the district court concluded, "Even with all reasonable inferences drawn in Rowles' favor, the record establishes that Rowles was punished for his conduct which was found to be unwelcome and hostile and not for engaging in protected speech." App. 578. Even if "Rowles' amorous speech might encompass protected speech," the court concluded that "the record does not demonstrate the deprivation of a clearly established constitutional right at the time Rowles was sanctioned." *Id.* The court's conclusion is wrong on both counts.

A First Amendment retaliation claim requires the plaintiff to show the following: (1) he engaged in a protected activity; (2) "the defendant took adverse action against him that would chill a person of ordinary firmness from continuing in the activity;" and (3) the adverse action was at all motivated by the protected activity. *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014). There is no dispute that Rowles

35

was suspended from the University for two years and permanently banned from all residence halls and the Rec Center by Defendants Eardley and Scroggs. App. 321-22, 394-96. Nor is there any dispute that Rowles's alleged violations of University policy consisted largely, if not exclusively, of oral and written communications. App. 333, 382-83, 406, 416. The only questions remaining are (a) whether his amorous speech is protected by the First Amendment, and (b) whether the discipline imposed on him was at all motivated by his protected speech.

### a. Rowles's amorous speech is fully protected.

There are a few "well-defined and narrowly limited classes of speech" not protected by the First Amendment: obscenity, *Roth v. United States*, 354 U.S. 476 (1957); defamation, *Beauharnais v. Illinois*, 343 U.S. 250, 254–255 (1952); fraud, *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976); incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (per curiam ); true threats, *Watts v. United States*, 394 U.S. 705 (1969); and speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949). Speech outside of these exceptions remains protected even when the subject is uncomfortable or violates standards of good taste. *See e.g., United States v. Stevens*, 559 U.S. 460 (2010) (invalidating statute prohibiting depictions of animal cruelty). "[T]he Supreme Court has consistently classified emotionally distressing or outrageous speech as protected…." *United States v. Cassidy*, 814 F. Supp. 2d 574, 582 (D. Md. 2011). "These principles acquire a special significance in the university setting, where the free and

36

unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 863 (E.D. Mich. 1989). Student speech is "generally protected as long as [it does] not materially and substantially interfere with the requirements of appropriate discipline or collide with the rights of others." *Salau v. Denton*, 139 F. Supp. 3d 989, 1009 (W.D. Mo. 2015).

"There is of course no question that non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001). "But there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive…." *Id.* "[W]hen anti-discrimination laws are applied to … harassment claims founded solely on verbal insults, pictorial or literary matter, the statute[s] impose[ ] content-based, viewpoint-discriminatory restrictions on speech." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir.1995). The same is true when the harassment claim is founded solely on compliments and expressions of attraction. "This sort of content- or viewpoint-based restriction is ordinarily subject to the most exacting First Amendment scrutiny." *Saxe*, 240 F.3d at 206. "If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

In *Cassidy*, 814 F. Supp. 2d at 582, the court considered an as-applied challenge to a federal statute that criminalized anyone who "with the intent … to kill, injure,

Appellate Case: 19-1946    Page: 48    Date Filed: 09/05/2019 Entry ID: 4827248

harass, or intimidate, or cause substantial emotional distress to a person … uses …
any interactive computer service … to engage in a course of conduct that causes
substantial emotional distress to that person….” 18 U.S.C. § 2261A(2)(A). The
defendant in that case made derogatory Twitter and blog posts about a member of his
religious sect. *Cassidy*, 814 F. Supp. 2d at 579–80. Finding that “Mr. Cassidy allegedly
violated the statute by intentionally causing substantial emotional distress … on
Twitter and Blogs,” the court concluded that the challenged statute was a content-
based restriction on speech. *Id.* at 584. Applying strict scrutiny, the court concluded
that protecting listeners from speech that inflicts emotional distress is not a
compelling governmental interest. *Id.* Even if it were, the court ruled the challenged
statute was not narrowly tailored to serve that interest. *Cassidy*, 814 F. Supp. 2d at 586.

The University’s sexual harassment policy is a content-based restriction on
speech because it applies to “verbal … conduct *of a sexual nature*.” CRR
200.010.C.7.b.1-2 (emphasis added). The stalking policy is similarly content based to
the extent it prohibits speech that would cause a reasonable person under the
circumstances to be “emotionally distressed.” CRR 200.010.C.7.d. Preventing
discrimination in education is a compelling government interest. *Saxe*, 240 F.3d at
209–10. However, Defendants have not produced any evidence to establish that CRR
200.010.C.7.b and d are narrowly tailored to achieve that goal.

Essentially, Rowles was suspended for directing amorous—but not
threatening—speech toward someone who wasn’t interested in him. Assuming his

38

conduct falls within the CRRs' definitions of sexual harassment and stalking, those CRRs are not narrowly tailored to prevent sex-based discrimination in education.

    **b.    Rowles raised a genuine issue of material fact as to whether his protected speech motivated the adverse action taken against him by Eardley and Scroggs.**

The district court granted summary judgment to Eardley and Scroggs on Count I, concluding that "the record establishes that Rowles was punished for his conduct which was found to be unwelcome and hostile and not for engaging in protected speech." App. 578. But contrary to the court's determination, nearly all of the "conduct" Eardley and Scroggs found to be "unwelcome and hostile" was speech: Rowles asked A.B. out on a date after class, App. 382, 382; sent A.B. several Facebook messages, App. 332-33; emailed A.B. about private dance lessons, App. 332; gave A.B.'s co-instructor a note to give her with song lyrics and the drink token she'd given him when they first met, App. 333; and, most importantly, handed A.B. his *three-page love letter*, App. 333. Every incident alleged by A.B. and cited in Eardley's decision is speech or expressive activity. Indeed, Eardley specifically references the *content* of Rowles's speech, finding that "[t]he letter [Rowles gave A.B.] *and the sentiments contained within* were unwelcome." App. 321 (emphasis added). Neither Defendants nor the district court have identified any *non*-expressive conduct supporting Rowles's suspension. Based on the evidence produced, Rowles raised a genuine issue of material fact that his protected speech was the reason for his suspension.

Appellate Case: 19-1946    Page: 50    Date Filed: 09/05/2019 Entry ID: 4827248

### C. The University's sexual harassment and stalking policies are unconstitutionally vague *as applied to Rowles*.

The district court erroneously ruled that the University's sexual harassment and stalking policies are not unconstitutionally vague as applied[4] to Rowles because "his conduct reasonably falls within that prohibited by the CRR's provisions," and "the language employed in the CRR relative to these policies create the permissible flexibility and reasonable breadth needed to enforce these policies while being sufficiently clear as to what conduct is prohibited." App. 581. That ruling should be reversed for two reasons. First, Defendants cannot even agree amongst themselves as to the scope of conduct prohibited under the definition of "sexual harassment." Second, the definition of "stalking on the basis of sex" does not provide explicit standards for those who apply the rule and is based largely on the subjective feelings of the complaining student.

To defeat a vagueness challenge, a statute must survive a two-prong test: "The statute must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement." *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455

---

[4] The court also ruled that the policies are not vague on their face. As Rowles's claim was strictly an as-applied challenge, he does not appeal from the court's ruling on the facial constitutionality of the University's polices.

Appellate Case: 19-1946    Page: 51    Date Filed: 09/05/2019 Entry ID: 4827248

U.S. 489, 498 (1982). For example, less specificity may be required of public-school

disciplinary rules. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986). On

the other hand, where a school's disciplinary code "is capable of reaching expression

sheltered by the First Amendment, the doctrine demands a greater degree of

specificity than in other contexts." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d

1303, 1308 (8th Cir. 1997). "Accordingly, while a lesser standard of scrutiny is

appropriate because of the public school setting, a proportionately greater level of

scrutiny is required because the regulation reaches the exercise of free speech." *Id.* at

1308–09.

### 1. Defendants cannot even agree amongst themselves as to the scope of conduct prohibited by CRR 200.010.C.7.b.

The University's Collected Rules and Regulations ("CRRs") identify three kinds

of prohibited "sexual harassment." The first kind involves "[u]nwelcome *sexual*

*advances* or requests for sexual activity by a person or persons in a *position of power* or

authority to another person." CRR 200.010.C.7.b.1 (emphasis added). The second

involves "unwelcome *verbal* or physical *conduct of a sexual nature* by a person to another

person, *when: Submission to or rejection of such conduct is used explicitly or implicitly as a condition*

*for academic or employment decisions*." CRR 200.010.C.7.b.2.a (emphasis added). The third

kind of sexual harassment involves:

> unwelcome *verbal* or physical *conduct of a sexual nature* by a
> person to another person, when: … Such conduct creates a
> hostile environment by being sufficiently severe *or*
> pervasive *and* objectively offensive that it interferes with,

41

> limits or denies the ability of an individual to participate in
> or benefit from educational programs or activities or
> employment access, benefits or opportunities.

CRR 200.010.C.7.b.2.b (emphasis added). Only the first and third definitions are arguably implicated in this case, but Defendants disagree on what conduct they prohibit.

The first definition of "sexual harassment" prohibits "[u]nwelcome *sexual advances* or requests for sexual activity by a person or persons in a *position of power* or authority to another person." CRR 200.010.C.7.b.1 (emphasis added). Neither "sexual advance" nor "position of power" is defined, permitting Title IX broad discretion to decide whose conduct qualifies. For example, Scroggs testified in her deposition that asking someone out is a "sexual advance." App. 413-14. She further testified that simply being physically larger than the person one is asking out on a date qualifies as a "position of power." App. 413. By contrast, Gallimore testified that "position of power" requires "some sort of evaluative or supervisory capacity." App. 424. Thus, Gallimore believes this definition does not generally apply to sexual advances between students. App. 424. Hayes sides with Scroggs rather than Gallimore, testifying that a man's size is sufficient to be a "position of power" over any woman physically smaller than he is. App. 305-06.

If Scroggs and Hayes are correct, then the Title IX Office may impose any level of discipline—up to and including expulsion—for an "unwelcome [request for a date] by a person [who is physically larger than] another person." That is exactly what

Appellate Case: 19-1946     Page: 53     Date Filed: 09/05/2019 Entry ID: 4827248

happened to Rowles. How can a student be expected to know whether his conduct is prohibited when the University officials charged with enforcement cannot even agree on the rule's meaning? Even if the rule's meaning were obvious to "a person of ordinary intelligence," Defendants' conflicting testimony strongly suggests "resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

The other definition of sexual harassment arguably applicable to this case prohibits: "unwelcome verbal or physical conduct of a sexual nature" that is "sufficiently severe *or* pervasive *and* objectively offensive" that it interferes with the ability of an individual to participate in educational programs or activities. CRR 200.010.C.7.b.2.b.2 (emphasis added). The rule does not define what is meant by the phrase "verbal …conduct of a sexual nature," leaving the Title IX Office wide discretion to determine what kinds of speech may qualify. A production of the play *Equus* by the University's theater department would seem to fall within this definition, as would an English professor's in-class reading of Walt Whitman's "I Sing the Body Electric." This concern is not idle speculation. In *Cohen v. San Bernardino Valley Coll.*, a professor playing devil's advocate during a class on sexual taboos was terminated for violating the college's sexual harassment policy. 92 F.3d 968, 970–71 (9th Cir. 1996). The policy defined sexual harassment as "verbal, written, or physical conduct of a sexual nature," including "circumstances in which … [s]uch conduct has the purpose or effect of unreasonably interfering with an individual's academic performance or

43

creating an intimidating, hostile, or offensive learning environment." *Id.* at 970–71.
Reversing the district court's verdict in favor of the college, the Ninth Circuit held
that the sexual harassment policy was unconstitutionally vague as applied to Cohen.
*Id.* at 972.

Admittedly, not all "verbal … conduct of a sexual nature" is prohibited under
the CRRs. The speech must also be "unwanted" and "sufficiently severe or pervasive
and objectively offensive" that it interferes with, limits, or denies educational
opportunities. CRR 200.010.C.7.b.2.b. In their depositions, Defendants offered a
range of interpretations for the latter phrase and could not agree on the meaning of
the "and" and the "or" in the policy. Eardley testified that the harassment policy first
requires the alleged conduct to be objectively offensive; then, *in addition*, it must also
be *either* severe *or* pervasive. App. 399-400. Scroggs, on the other hand, considers the
policy to apply if *any one of the three terms* (severe, pervasive, or objectively offensive) is
satisfied. App. 414. Gallimore believes any conduct that interferes with, limits, or
denies the ability of an individual to participate or benefit from an educational
program or activity *necessarily* satisfies the "severe or pervasive and objectively
offensive" requirement. App. 425.

Like their divergent interpretations of the terms "sexual advance" and "power"
in CRR 200.010.C.7.b.1, Defendants' conflicting testimony as to the requirements of
CRR 200.010.C.7.b.2.b increases the likelihood of arbitrary or discriminatory
enforcement. If Scroggs is correct, "verbal … conduct of a sexual nature" does not

44

have to be "objectively offensive" as long as it is either "severe" or "pervasive." If Gallimore is correct, "verbal ... conduct of a sexual nature" does not need to be "severe" or "pervasive" or "objectively offensive" as long as it "interferes with, limits or denies the ability of an individual to participate in or benefit from educational programs or activities." Indeed, it's not even clear whose interpretation of these standards was applied in Rowles's case. Eardley did not find that Rowles' conduct was "severe" or that it was "objectively offensive," only that it was "pervasive." App. 322. Scroggs brushed aside this argument on appeal: "By noting that [Rowles's] conduct was hostile under an objective standard, the decision was indicating that it met the criterion of being objectively offensive." App. 394. Any regulation that permits such linguistic shell games "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999).

2. **The definition of "stalking on the basis of sex" does not provide explicit standards and depends on the subjective feelings of the complaining student**.

The University defines "stalking on the basis of sex" as "following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." CRR 200.010.C.7.d. As noted above, there is no allegation—much less any evidence—that A.B. was ever *in fear* (reasonably or otherwise) for her safety. App.

45

405. Nor is there any evidence that she was "frightened" or "intimidated." App. 404-06, 416. In order to have violated this rule, Rowles must have engaged in "a *course of conduct on the basis of sex* with *no legitimate purpose* that … would cause a reasonable person under the circumstances to be … *emotionally distressed*." CRR 200.010.C.7.d (emphasis added). As with the definition of sexual harassment, the definition of stalking impermissibly vests the Title IX office with basic policy making authority to determine what courses of conduct have a "legitimate purpose" and what kind of reaction qualifies as "emotionally distressed."

Eardley could not identify any guidelines for determining whether a course of conduct has "no legitimate purpose," basing her rulings on what she thinks "the university community would expect." App. 400-01. She testified that the standard for whether someone's course of conduct has a legitimate purpose is different for graduate and undergraduate students even though the CRRs themselves do not differentiate between classes of students. App. 401-02. For Scroggs, an expression of romantic interest has no legitimate purpose *unless* the romantic interest is reciprocated by the audience of the expression. App. 414-15. In other words, for Scroggs the legitimacy of a suitor's purpose in asking someone out depends not on his own feelings or intentions but on the feelings of the object of his affection. Hayes was even more equivocal, stating "I don't know that there is a definition specifically for legitimate. I think you can't dissect it by that individual word. I think you have to look at the sentence as a whole and the facts of the whole entire situation." App. 420.

Appellate Case: 19-1946    Page: 57    Date Filed: 09/05/2019 Entry ID: 4827248

Unable explain how a student could know whether he has a "legitimate purpose" in asking someone out, Hayes suggested he contact the Title IX Office for clarification. App. 419. Even then, she could not say whether that student would get the same answer from different members of her staff. App. 420. Defendants' varied responses demonstrate that CRR 200.010.C.7 has "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)

Defendants were similarly at odds over the term "emotionally distressed." Eardley testified it means "a state of emotional discomfort." App. 403. Hayes testified it could mean "upset," "angry," "sad," "uncomfortable" or even "annoyed." App. 421. Scroggs testified the "emotional distressed" prong "could just be more of amplification of the fear and distress or the fear and intimidation so they -- they have emotional outbursts as a result of that." App. 415. Such vague and inconsistent standards invite arbitrary and discriminatory enforcement. *See Coates v. City of Cincinnati*, 402 U.S. 611, 612 (1971) (holding an ordinance as void for vagueness where it prohibited "conduct...annoying to persons passing by").

The vagueness of the stalking policy is exacerbated by the lack of an intent requirement. "[T]he constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). In *Colautti*, the Supreme Court considered a Pennsylvania statute prohibiting abortion "if there is sufficient reason to believe that the fetus may

47

be viable." *Id.* at 392. Because the provision had no scienter requirement, the Court found it little more than "a trap for those who act in good faith." *Id.* at 395. In *Clary v. City of Cape Girardeau*, the court found a city noise ordinance lacking any mens rea requirement void for vagueness, noting that "it matters not whether the hooter, singer, or whistler intends to offend, only that a third-party, the victim, is annoyed or disturbed." 165 F. Supp. 3d 808, 822 (E.D. Mo. 2016) ("The fact that a person only violates the ordinance if his or her action evokes a particular response from a third party is especially problematic because of the ordinance's resulting chilling effect on core First Amendment speech."). Similarly, in *Stahl v. City of St. Louis, Mo.*, the Eighth Circuit invalidated an ordinance prohibiting expressive activity "if it has the consequence of obstructing traffic" because "violation of the ordinance does not hinge on the state of mind of the potential violator, but the reaction of third parties." 687 F.3d 1038, 1041 (8th Cir. 2012).

The University's definition of stalking does not require any showing that the alleged stalker *intended* to frighten, intimidate, or cause emotional distress. The rule imposes strict liability *regardless of the speaker's intent*. CRR 200.010.C.7.d. The lack of a mens rea requirement is especially problematic in this case because A.B. reported that Rowles's actions were "not necessarily malicious" and that he "just didn't pick up on social cues." Defendants' conflicting testimony as to what conduct the stalking policy prohibits and its lack of a scienter requirement—not to mention the absence of any

48

evidence that Rowles intended to frighten, intimidate or distress A.B.—further

supports a finding that the policy is vague *as applied to Rowles*.

### D. Rowles raised triable issues of fact precluding summary judgment on his Title VI claim.

The district court's summary judgment ruling in favor of the University on

Rowles Title VI claim was the inexorable result of its earlier ruling on Rowles's

motion to compel. As the court observed,

> While the record demonstrates that the other students found to have violated the University's policies against sexual harassment and stalking on the basis of sex are perceived as white and received lesser sanctions than Rowles, the record does not establish that the circumstances surrounding these other two instances of violation of the University's policies are suitable comparators for purposes of Rowles establishing race discrimination…. Though Rowles argues that the information necessary to establish these comparable circumstances is in the unique possession of the Curators, *this Court previously found further discovery into the underlying facts of other Title IX complaints need not be produced to, among other reasons, preserve victim confidentiality.*

App. 566-67 (emphasis added). Simply put, Rowles was unable to compare the

circumstances in which the white students received lesser punishment *because* the court

denied Rowles's motion to compel. The district court then compounded its erroneous

discovery ruling by misapplying the burden-shifting analysis used in Title VI cases.

A Title VI plaintiff must show that the defendant receives federal funds, the

plaintiff was discriminated against, and the plaintiff's race, color, or national origin

motivated the discrimination. *Rodgers v. Univ. of Mo. Bd. of Curators*, 56 F. Supp. 3d

49

1037, 1047 (E.D. Mo. 2014) (citing *Thompson v. Bd. of the Special Sch. Dist. No. 1*, 144 F.3d 574, 581 (8th Cir. 1998). Curators admit receiving federal funds, so Rowles need only show he was discriminated against on the basis of his race. In the absence of direct evidence of discriminatory animus, Title VI claims are analyzed under the *McDonnell Douglas* burden-shifting analysis. *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998). First, a plaintiff must demonstrate a prima facie case of discrimination. *Goyal v. Univ. of Minnesota*, No. COV03-5484(JNE/FLE), 2005 WL 2290281, at *2 (D. Minn. July 22, 2005). The burden then shifts to the defendant to provide a legitimate, *nondiscriminatory* reason for the disparate treatment. *Id.* If the defendant meets this burden, the plaintiff must show that the proffered nondiscriminatory reason is pretextual. *Id.*

To establish a prima facie case of discrimination based on race, Rowles had to show:

> [1] he is a member of a protected class, [2] he suffered an adverse action at the hands of defendants in pursuit of his education, [3] he was qualified to continue in pursuit of his education, and [4] he was treated differently from similarly situated students who were not members of his protected class.

*Ajiwoju v. Curators of Univ. of Missouri*, No. 06-1005-CV-W-FJG, 2009 WL 10705058, at *2 (W.D. Mo. Feb. 11, 2009), aff'd sub nom. *Ajiwoju v. Univ. of Missouri-Kansas City*, 363 F. App'x 420 (8th Cir. 2010). He easily satisfies the first three elements. Rowles is an African American man. App. 317. He was suspended from the University. App.

Appellate Case: 19-1946     Page: 61     Date Filed: 09/05/2019 Entry ID: 4827248

323-34. At the time of his suspension, he was in an ongoing Ph.D. program. App. 319.

Rowles has also satisfied the fourth element—that he was treated differently from similarly situated students who were not members of his protected class. As the only black student found responsible for *both* sexual harassment and stalking, Rowles was suspended from all four campuses for two years (reduced from the original sanction of four years) and banned for life from all residence halls and the Student Rec Center. App. 624. The two white students found responsible for *both* sexual harassment and stalking sex received significantly lighter sanctions. App. 617. Student No. 22 was sent to counseling and not suspended at all. App. 617. Student No. 24 was suspended for only six months, barred from residence halls (but not the Student Rec Center), and required to undergo counseling. App. 617-18. The difference between the punishment imposed on Rowles and Student No. 24 is even more striking because No. 24 was also found responsible for *non-consensual sexual contact, non-consensual sexual intercourse, and threatening or intimidating behaviors*. App. 617-18. In other words, Rowles—whose amorous speech was neither threatening nor malicious—was suspended *four times longer* than a white student who committed *sexual assault*. Based on the only information the University provided, Rowles satisfied his burden to show he was treated differently from similarly situated white students.

Once a plaintiff establishes his prima facie case for race discrimination under Title VI, the burden shifts to the defendants to produce evidence of a legitimate *non-*

51

*discriminatory* reason for plaintiff's disparate treatment. *Goyal,* 2005 WL 2290281, at *2.

"A defendant's burden at the second stage of the *McDonnell Douglas* analysis in a

disparate discipline case cannot be met 'by merely restating [the] offense for which a

plaintiff was disciplined.'" *Campbell v. Town of S. Pines*, No. 1:03CV00892, 2005 WL

1802405, at *13 (M.D.N.C. July 28, 2005) (quoting *Moore v. City of Charlotte, NC*, 754

F.2d 1100, 1106 (4th Cir. 1985)). "Instead, a defendant must address the contested

issue by giving insight into the discretionary factors underlying defendant's decision to

[treat] two individuals differently." *Id., see also Gates v. Georgia-Pac. Corp.*, 492 F.2d 292,

296 (9th Cir. 1974) (employer failed to meet its burden where proffered legitimate

nondiscriminatory reason was not applied equally to black and white employees);

*Acosta v. Univ. of D.C.*, 528 F. Supp. 1215, 1223 (D.D.C. 1981) (university failed to

show legitimate non-discriminatory reason where its proffered reason did not apply to

both white and black faculty). "If the defendant fails to do so, the plaintiff is entitled

to a finding of intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d

771, 777 (8th Cir. 1995).

Defendants failed to meet their burden. They have not identified any *non-*

*discriminatory* reason for disciplining Rowles so much more severely than the two white

students accused of violating the same rules, nor have they produced a scintilla of

evidence to justify his disparate treatment. Indeed, Defendants refused to produce *any*

records regarding the complaints against Students Nos. 22 and 24, the investigations

into those complaints, or the final decisions rendered by Title IX Office. In

52

deposition, Hayes, Eardley, Scroggs, and Gallimore were all unable to explain what the two white students had actually done or why they received more lenient sanctions than Rowles. App. 408-09, 417-18, 422, 426. Having produced no evidence in discovery of any legitimate *non-discriminatory* reason for punishing Rowles far more harshly than the two white students found responsible for violating the same rules, Defendants cannot shift the burden back to Rowles and are therefore not entitled to summary judgment.

Even assuming Defendants had offered a legitimate *nondiscriminatory* rationale for Rowles's suspension—which they haven't—there is enough evidence from which a rational juror could find that Rowles was treated differently from the two white students found responsible for the same or more serious offenses. Indeed, the evidence Defendants have produced shows unequivocally that Rowles was treated far more harshly than white students who violated the same rules. Perhaps there is some legitimate nondiscriminatory reason for suspending Rowles four-times longer for writing a letter than a white student who committed *sexual assault*. But if there is, Defendants are the only parties in possession of that reason, and they have steadfastly refused to provide it.

Defendants should not be allowed to use the court's discovery ruling as both a sword and a shield. If they are not required to disclose the circumstances in which two white students received far more lenient discipline than Rowles for the same or more

53

serious violations of University rules, Defendants should not be heard to complain that Rowles is unable to prove those students are similarly situated.

## CONCLUSION

This Court should reverse the dismissal of Counts II, VII, VIII, and IX; order Defendants to produce the documents necessary to determine whether other students disciplined for sexual harassment or stalking are similarly situated to Rowles; reverse summary judgment in Defendants favor on Counts I, III, and VI; enter summary judgment for Rowles on Count III; and remand for further proceedings.

Respectfully submitted,

 /s/ *J. Andrew Hirth*
J. Andrew Hirth
MO Bar No. 57807
TGH LITIGATION LLC
28 N 8th St, Suite 500
Columbia, MO 65201
(573) 256 – 2850
(573) 213 – 2201 (fax)
andy@TGHLitigation.com

Attorneys for Appellant
Jeremy A. Rowles

54

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies, pursuant to Fed. R. App. P. 32(g), that:

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,941 words as determined by the word counting feature of Microsoft Word 365.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in the proportionally spaced typeface of 14-point Garamond.

3.     Pursuant to Local Rule 28A(h), this Brief and accompanying Addendum have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free

/s/ *J. Andrew Hirth*
*Counsel for Appellant*

55